# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7115 | **DATE** | 7/1/2002 |
| **CASE TITLE** | George K. Vs. Gregory T. Jackson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied with prejudice. Enter memorandum and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | JUL 0 2 2002 | | |
| | Notified counsel by telephone. | | JUL date docketed 2002 | | 55 |
| | Docketing to mail notices. | | docketing deputy initials | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| SLB | courtroom deputy's initials | 02 JUL -1 PM 2: 40 FILED date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| EDWIN K. and HATTIE and ) <br> ) <br> GEORGE K., Individually and as ) <br> Next Friends of Edwin K., ) <br> ) <br> Plaintiffs, ) <br> ) <br> -vs.- ) <br> ) <br> ) <br> GREGORY T. JACKSON, In His ) <br> Official Capacity as Superintendent ) <br> and PROVISO TOWNSHIP ) <br> SCHOOL DISTRICT #209, ) <br> ) <br> Defendants. ) <br> ) | **DOCKETED** <br><br> JUL 0 2 2002 <br><br> No. 01 C 7115 <br><br> Senior Judge George W. Lindberg |

## MEMORANDUM AND ORDER

Plaintiffs, Edwin K. and Hattie and George K., parents of Edwin K., have filed a

complaint pursuant to Section 1415(i)(2)[1] of the Individuals with Disabilities Education Act, 20

U.S.C. § 1400 et seq. ("IDEA") seeking to overturn the administrative decision issued by

Impartial Hearing Officer Vivian Gordon (the "IHO") on May 16, 2001, which the IHO rendered

following a ten-day special education due process hearing pursuant to the IDEA, 20 U.S.C. §

1401 et seq. Both parties moved for summary judgment. For the reasons stated below,

Defendant's summary judgment motion is granted and Plaintiff's summary judgment motion is

---

[1]Plaintiff's brief states Section 1415(e)(2), however the IDEA was amended in 1997 and
the Court has included the correct Section letter.

denied, with prejudice. However, the Court has granted some additional relief to Plaintiff pursuant to Section 1415(i)(2) of the IDEA.

## I.  Factual Background

What follows is a version of the facts culled from the Plaintiff's and the Defendant's Statement of Facts, taking into account the opposing party's response to those facts under Local Rule 56.1. The following facts, except where explicitly mentioned, are not in dispute.[2]

### A. The Parties

Plaintiff, Edwin K. ("Edwin") is a 19-year-old student who was initially found eligible for special education during elementary school due to his diagnosis of Attention Deficit Disorder ("ADD").      Plaintiffs Hattie K. and George K. are Edwin's mother and father respectively ("Parents"). Defendant Gregory T. Jackson is the Superintendent of Proviso Township High School District # 209. Defendant Proviso Township School District #209 ("School District") is a school district located in the Northern District of Illinois and is a body politic and corporate organized pursuant to the Illinois School Code. By federal and state law, the school district is responsible for ensuring that students with disabilities are provided a free appropriate public education ("FACE").

### B. Edwin's Schooling History

---

[2]However, the Court does not accept any unsupported statements or mischaracterizations of the record. In certain places in this recitation of facts, the Court notes that a statement is only the testimony of either Dr. Appleby or Mrs. Edwin K., and therefore not supported by any other proof in the record.

### i. 1995-1996

During the 1995/96 school year, Edwin was an eighth grade student in a public middle school that fed into Proviso West High School ("PWHS"). During Edwin's eighth grade school year he was categorized as a student with a behavior disorder ("BD"). Prior to Edwin's enrollment at PWHS and during his eighth grade school year, an IEP meeting was held. A representative from PWHS was in attendance at that meeting.

PWHS was aware that Edwin was eligible for special education in the eighth grade when he was matriculating into high school, and a representative from the high school, Gail Suffredin, attended Edwin's IEP meeting during his eighth grade year to arrange his transition to high school. At the time that Edwin was transitioning out of eighth grade into high school, the District was aware that Edwin had been diagnosed with ADD. The District kept a record of the matriculation IEP conference, however when Edwin attended St. Joseph's Academy instead of PWHS, a deactivation notice from special education was prepared by Tracy Kline, District #209 Department Chairperson for Special Education. Edwin did not matriculate to PWHS for the 1996/7 school year but attended St. Joseph Academy, a parochial school, instead. Edwin did not return to PWHS for 1 ½ years. According to his parents, Edwin left St. Joseph's in January 1988 because administrators expressed concern that his grades were poor, he was accumulating detentions, and that his special education needs would be better met in the public schools.

### ii. 1998 - Proviso West High School

In January of 1998, Edwin's father re-enrolled Edwin at PWHS but did not notify
District personnel about Edwin's special education background. On the registration form for
enrollment, Edwin's father indicated that Edwin had not previously received any special
education services.

Within two months of Edwin's entrance into PWHS, a screening team request was
initiated on March 25, 1998. The screening team referenced Edwin taking the medication
Ritalin twice per day; the school district psychologist was asked to do an observation of Edwin
prior to a meeting held in March 1998. At the meeting, Mrs. K. told the school team about
Edwin's special history and about Edwin's Attention Deficit Disorder ("ADD") and its
symptoms. The reasons listed for the request of this observation were parent's concern
regarding the student's truancy, his failure to follow rules and his frequent attendance in a
disciplinary study hall; Mrs. Edwin K. also hoped to obtain assistance for Edwin in his
transitioning to PWHS so that he could be successful in his classes. The problems indicated by
the school district included truancy, tardiness, being disruptive, incomplete assignments, poor
attention span, poor organizational skills, low academic performance, poor class participation
and poor motivation. On the "Summary of Behavior Problems," Edwin was reported to engage
in disruptive classroom behavior only occasionally. Other behavior problems, such as attention
span, organizational skills, and completing assignments were listed as occurring some of the
school day. At the screening team meeting, no problems were reported concerning interpersonal
relationships, physical aggression, illegal behavior, fighting, delusional thinking or serious
mental health problems. At this time, it was agreed that District staff member Tracy Kline

4

would monitor Edwin's progress for the remainder of the second semester, and if necessary at that time, discuss a case study evaluation.

During the second semester of the 1997-98 school year, Edwin failed a number of courses. In August of 1998, Tracy Kline and Edwin's mother communicated regarding his fourth quarter and summer school progress. At that time, the parent requested a case study evaluation. A meeting was scheduled for September 29, 1998 but was continued to October 8, 1998.

### iii. The IEP meeting- October 8, 1998

In August 1998, after Edwin had failed five classes during his second semester of his sophomore year at PWHS, the school agreed to perform a case study evaluation. A meeting was held on October 8, 1998 to review the case study evaluation components. (Although the IEP meeting was held on October 8, 1998, the IEP is dated September 29, 1998.) At that meeting, it was reported that Edwin's IQ was average to above average and because of his behavioral difficulties, he qualified for behavioral/emotional disorder exceptionality. Edwin was determined eligible for special education services under the emotionally/behaviorally disordered classification and an IEP was developed. The District made Edwin eligible for special education under the label BD/ED because the District believed that Edwin met one of the inclusionary factors for BD/ED: inappropriate types of behavior or feelings under normal circumstances. The District believed that Edwin satisfied the BD/ED label because of the following behaviors: coming to class late, sleeping in class, not focusing on work, refusing to do classwork, not accepting responsibility, socializing with other students during class, not

5

paying attention and asking the teacher what he or she is talking about when redirected. Although the District noted that Edwin's classroom behavior indicated many AD/HD symptoms, the District asserted that Edwin was making deliberate behavioral choices.

It was determined that informal measures in the classroom and consulting with teachers regarding strategies related to the student's behavior instead of a behavior management plan would be appropriate. However, Tracy Kline, the Department Chairperson for Special Education at PWHS admitted that the school district should have prepared a behavior management plan for Edwin in October 1998. Edwin was also provided 100 minutes of resource services and assigned a case manager who would consult with Edwin, his teachers and his mother.[3] At that time, Edwin was failing most of his classes due to truancy, lack of participation, not turning in work, and lack of cooperation with teachers. Special education resource services were made available to Edwin to assist him. Social work services were also provided by the school district. Edwin was failing his math class, however, despite his failure, and his math achievement scores, the school district did not make him eligible for special education as a student with learning disabilities in math because the school asserted that the discrepancy between Edwin's ability and math achievement was not sufficiently significant and because the school claimed that it could not rule out the effects of behavior difficulties and AD/HD on Edwin's performance.

### iv. The BD program at PWHS

---

[3]Plaintiffs deny he received 100 minutes, but provide no support for denial as necessary under Local Rule 56.1

The BD resource program in which Edwin was placed at PWHS had no academic curriculum, no social or behavioral skills curriculum, no study skills curriculum, and no organizational skills curriculum. Students placed in BD resource went to the resource room during their study hall period, which was approximately twenty minutes long. During resource, the students would work on their school work and the BD teacher would talk to them about their IEP goals. Edwin was placed in the resource room twenty minutes a day, for four days of the week. Generally, students in the BD resource program were passing their classes except for one or two. Edwin was passing very few of his classes.

### v. December 1998–District recommends self-contained BD/ED program at PAEC

On December 17, 1998 another IEP meeting was held to discuss Edwin's current progress and consider a program services change. As of that date, Edwin was failing all of his classes, with the exception of Drama, in which he was receiving a D. Edwin continued to have the same problems identified in October 1998, including taking responsibility for work, not paying attention in class, and failing to complete and turn in work. (None of Edwin's regular education teachers attended his December 1998 IEP meeting.) Improving organizational skills, improving attention to task and improving frustration tolerance are the only goals on the December 1998 IEP. There are no goals that address math or written expression or overt behavioral difficulties. The IEP does not include a behavior management plan, there are no goals or objectives written to improve Edwin's attendance. At this IEP meeting, thirty minutes per week of direct social work services and thirty minutes per week of consultative social work services were added to Edwin's IEP. However, at that time, PWHS recommended that Edwin

7

be transferred to a self-contained special education classroom for children with Emotional/Behavior Disorder (BD/ED). The District's social worker, and Tracy Kline, both supported this recommendation, although neither had observed Edwin in a classroom.

In January 1999, the District recommended PAEC High School, an alternative high school in which primarily behavior disordered students enroll. Edwin's mother requested an opportunity to observe the classroom first and later indicated that she did not believe those classes would be appropriate. She felt that additional accommodations could be made within Edwin's regular education classes combined with resource services and social work services. PWHS staff agreed to accommodate this request. Edwin's mother also indicated at that time that she was going to investigate educational options outside of PWHS. After Mrs. K. observed the BD/ED self-contained program, the District kept Edwin in BD resource, but Tracy Kline added the following accommodations to the IEP without an IEP meeting: "extended due dates if appropriate, behavioral cueing, resource teacher and social worker consultations with other teachers." Neither resource minutes nor social work minutes were increased.

### vi. 1998-1999 at PWHS

Between December 1998 and November 1999, any additional modifications or accommodations attempted for Edwin by the District were sufficiently minimal that the District did not perceive a need to convene a meeting to discuss whether they should be implemented. The BD resource teacher never implemented a positive behavioral management system for Edwin; the resource teacher believed that positive reinforcement would be a good thing for Edwin at PAEC High School, but not in regular education classes.

8

During the second semester of the 1998-99 school year, Edwin was referred for discipline, received an in-school suspension for violations of the dress code and security code, was found cutting class, remained in the hall after the tardy bell, was late for class, removed from class for disruptive behavior and had five referrals for discipline or suspension during a three-week period. During the 1998-1999 school year, while Edwin was attending PWHS, Edwin was sent regularly, several times per week, to Study Hall E5 for tardiness and Study Hall C116 for general behavioral concerns. While at PWHS, Edwin told the District social worker that he felt overwhelmed; contributing to this feeling was that he felt he had difficulty with many of the rules at school, and had poor attendance, difficulty with the school's ID procedure and suspensions. During the 1998-1999 school year at PWHS, Edwin served in school and out of school suspensions for not immediately going into a disciplinary study hall, for not attending class, and for being in the hallway five minutes after the tardy bell rang. In December 1999, one of Edwin's teachers noted in a report that sending Edwin to disciplinary study halls or to his counselor, or calling his mother, caused little or no behavioral change. Detentions were also not effective to modify Edwin's behavior of coming to class late. At the end of the 1998-1999 school year, Edwin was still having the same behavioral problems at PWHS that he had at the beginning of the school year.

On December 9, 1999, a student found a note written by Edwin that indicated suicidal ideation. The staff looked for Edwin but could not locate him. Edwin left school only to return to school property with alcohol and marijuana. The school district provided Edwin's parents with referrals for psychiatric services and attempted to follow up with the parents regarding his

issue. Edwin was suspended from school pending a disciplinary hearing. Tutorial, homebound services were offered by the school district and refused by the parent. At that time, Edwin was failing classes, not coming to class, sleeping in class, and coming to class unprepared. This incident was determined by the IEP team to be a manifestation of Edwin's disability. After the incident, Mrs. K. requested accommodations in each of Edwin's classes, and that more support and assistance be provided to Edwin. The District recommended that Edwin attend PAEC High School to provide a highly structured program with a system of accountability and consequences. On January 3, 2000, the parents, through counsel, filed a due process hearing request.

### vii. January 2000 - IEP Meeting

On January 4, 2000, an IEP meeting was held, and the District's recommendation was for the PAEC High School Program. At the due process hearing, representatives from PAEC were present to address issues about the program, Edwin's educational needs, and ways in which behavior was handled at PAEC. PWHS was willing to defer to the wishes of Edwin and his mother regarding placement at the TALENTS program–a computer-based instructional program run by District 209 and located off site of PWHS–if it was felt that the prospect of Edwin attending and succeeding in the TALENTS program would be sufficiently motivating for him to overcome the behavioral deficits that were being demonstrated at PWHS. The school district determined at this time that a functional behavioral assessment would be performed at Edwin's new placement and would be the subject of another meeting in which current progress could be assessed. The District committed, if Edwin and his parents chose the TALENTS

program, to both meetings with the TALENTS staff to inform them of Edwin's learning and behavioral profile and forwarding a copy of Edwin's IEP to discuss accommodations and modifications. The parents disagreed with the district's recommendation for placement at PAEC, and desired Edwin to attend the TALENTS program.

The January IEP does not contain any goals relating to math or written expression. The January IEP states "N/A" under Program Modifications or Supports, although various supports and modifications would be appropriate for Edwin.

On or about January 6, 2000, the Illinois State Board of Education appointed Dr. Vivian Gordon as the impartial hearing officer in this matter. Dr. Gordon's background includes 19 years of experience in the area of school law. Dr. Gordon held positions that had included teacher, assistant professor of law, author of law related education textbooks used nationwide and Level II due process hearing officer. At that time, Dr. Gordon was not only a State Board due process Hearing Officer but also served as a Teacher Dismissal Hearing Officer, an IDEA Part C Hearing Officer for the Department of Human Services, an Adjunct Professor at Blitstein Teacher's Institute and was in private practice.

### viii. 2000 - TALENTS

Edwin began attendance at TALENTS (which stands for Tailoring Alternative Learning Experiences in NonTraditional Settings) in late January 2000. TALENTS is a computer aided instruction program in which students receive academic instruction by computer in English, math, science, social studies and electives; there is also a life skills course and a writers' workshop and each student is required to do 90 hours of community service. The computer

based courses are individualized according to the student's graduation requirements, and each student works at his own pace. The typical student at TALENTS was truant at Proviso West or Proviso East High School, deficient in credits, not generally a behavior problem, ready and motivated to complete high school and had the academic ability to work on a computer system independently. Edwin was never aggressive or threatening while at TALENTS. According to IHO Vivian Gordon (AR 2468) - he was defiant and disrespectful at times, he would ignore things the teachers would tell him; he frequently walked out even though he was told to stay in the school. She also said he was allowed to turn assignments in late, and staff gave him a lot of personal attention.

### ix. February 29, 2000 IEP

On February 29, 2000, an IEP meeting was held to develop a behavior intervention plan, develop a transitional plan, discuss IEP goals and objectives, discuss Edwin's progress at TALENTS, discuss accommodations for Edwin at TALENTS, and discuss the parent's request for an independent evaluation. At the February meeting, the TALENTS staff reported that Edwin was working very slowly, his essays were not well organized, his thoughts were not adequately developed, assignments were not completed on a timely basis, and he had difficulty responding appropriately to his teachers' requests in writers workshop. The TALENTS staff indicated that Edwin continued to exhibit deficits in the areas of frustration tolerance, coping skills, accepting responsibility for actions and problem solving. In addition, he continued to have a difficult time sustaining attention to a task. The TALENTS staff identified the following behavior problems of Edwin's: challenging persons in authority, difficulty attending and

incomplete assignments. However, his attendance and arrival to class on time had improved significantly since he was enrolled at TALENTS. As of the February 29, 2000 meeting, Edwin had not met any of the goals and objective written in his December 17, 1998 IEP.

At Edwin's February 29, 2000 IEP meeting, the team wrote in Edwin's behavior management plan that the TALENTS staff would determine the average amount of time required to complete a computer aided assignment and would tell Edwin when he should be halfway completed with the assignment. This plan was not effective. The IEP team set up a plan to require Edwin to stay an extra hour after school and to tell him how long each assignment would take, but this did not help his pace of assignment completion. The TALENTS program director has no training in the development of behavior management plans or in conducting functional behavior analysis. At TALENTS, Edwin struggled academically; his writer's workshop instructor was concerned about his skill level; at the time of his February IEP, his main problems at TALENTS were that he was spending too much time on lessons, having to redo things, having no notebook, and not completing community service. The program director at TALENTS believed there were no other accommodations or modifications that could be done to the TALENTS program to make him more successful. The District did not provide the social work listed in Edwin's IEP.

At that time, PWHS staff reiterated their recommendation for Edwin's placement at the PAEC High School program. However, they committed to continued funding of the TALENTS program as a good faith effort toward resolution of this matter. The TALENTS staff had continual and frequent contact with Mrs. K. regarding the difficulties they were having with

Edwin's compliance, work completion, adherence to rules and compliance with authority figures. Despite Edwin's improvement in the areas of truancy and tardiness, Edwin only passed one course during the entire second semester of 2000.

### x. Behavior Intervention Plan-Part of February 29, 2000 IEP

A Behavior Intervention Plan ("BIP") was first developed for Edwin at the February 29, 2000 IEP meeting. Edwin's behavior management plan was ineffective in raising Edwin's grades, helping him get work done, helping him be organized and prepared for classes, increasing his work output or improving on task behavior. Dr. Appleby testified that the behavior management plan written at the February 29, 2000 IEP meeting contains an informal classroom observation, but is not as structured or quantitative as a functional analysis usually is. No new observation was done between the February 2000 and September 2000 BIP, and there were no significant changes in strategies being used to address Edwin's behaviors from February 2000 to September 2000. According to Dr. Appleby's testimony, he testified that the BIP lacked the use of positive reinforcement behavior techniques, which would have bene effective with Edwin, and rather too much burden for follow through was put on Edwin. Dr. Appleby and Terry Smith testified that if a plan is not working, a new plan should be developed; although Edwin made no progress under the February 29, 2000 behavior management plan, no changes were made to the plan at the September 7, 2000 meeting.

### xi. June 2000-Special Education Reevaluation of Edwin

Edwin's grade equivalency for his overall achievement score in math was eighth grade, one month. Douglas Hopper, the school psychologist, did not administer any processing tests

or consider Edwin to have a math learning disability because Edwin did all math problems in his head and because he didn't do a lot of work in his math classes. Hopper did not administer any tests to assess whether Edwin had a writing disability. He did not administer or recommend any testing of Edwin's fine motor skills or of his motor integration skills. When administering the Devereaux Behavior Rating Scale, which correlates to the criteria for BD/ED, the school psychologist reported that Edwin received a borderline significant score in inappropriate behavior and feelings from only one of his three teachers at TALENTS. At the September 7, 2000 IEP meeting, however, Edwin was labeled Behavior/Emotional disordered based on inappropriate behavior or feelings. Compared to the 1998 psychological testing, the 2000 Devereaux results suggested a significant improvement in Edwin's behavioral functioning. The school psychologist found only borderline significance of depression. When the school psychologist observed Edwin at TALENTS, he noted that Edwin was less on task than the other students and worked only when there was a teacher near him.

### xii. September 7, 2000 - IEP

On September 7, 2000, the District and parent met to review Edwin's IEP, the psychological report by the school psychologist, Doug Hopper, and the private neuropsychological evaluation of Dr. Appleby. At this time, the IEP team found that Edwin continued to be a student with a behavioral/emotional disorder. They further found that he qualified under the category of Other Health Impaired ("OHI") due to a diagnosis as a student with ADD. The ADD diagnosis had been made as early as the 1989/90 school year by Dr. Renshaw. The District had been notified by Edwin's parents on or about February 25, 1998 that

Edwin had ADD. The testimony and evidence in the due process hearing indicated that whether or not ADD was documented as disability, the school district was aware of this component of Edwin's disabilities and continued to make accommodations and modifications related to symptoms of ADD for Edwin, though the district did not initially list it as a disability designation: "[t]he evidence and testimony indicate the student's behavior goes beyond symptoms of ADD and these behaviors are the major impediment to his ability to achieve success in school." There was no additional testing done by the District from June 2000 to September 7, 2000 that would account for why OHI was added as a disability.

At the conclusion of this September 7, 2000 IEP meeting, Edwin's present levels of academic performance indicated that he still needed two full years of English, 1.5 years of math, 1.5 years of social studies, 2 years of science and a total of 90 hours of community service (76 hours remaining). Edwin's social/emotional level of performance included not accepting responsibility for his actions, poor impulse control, poor frustration tolerance and low self-esteem, motivation and effort. The district reiterated its recommendation for Edwin's placement at the PAEC High School. The district staff felt that the TALENTS program did not offer the support and structure that was necessary in order to appropriately implement the IEP goals and provide support. At that time, the parents had already filed a due process hearing request, and Edwin remained at the TALENTS program.

**xiii. Special Education Due Process Hearing-September, October, November, 2000-January 2001-The IHO's Conclusions**

A special education due process hearing for Edwin was held on September 25, 26, and 27, October 23, November 15, 16, 20 and 21, 2000 and January 29 and 30, 2001, before IHO Dr. Vivian Gordon, J.D., Ph.D., pursuant to the IDEA, 20 U.S.C. s 1401 *et seq.*

At the time of the hearing, Edwin was a fifth year senior within Defendant's schools during the 2000-2001 school year. Despite being in his fifth year of high school at the time of the hearing, he had only earned two years of high school credit. On May 16, 2001 IHO Vivian Gordon issued her Decision and Order. She denied the parents' request for an additional vocational evaluation, and for further evaluations related to occupational therapy. She found that the District should be given an opportunity to consider additional evidence on whether an auditory processing evaluation is warranted.

The IHO concluded that the school district's primary disability classification of END for Edwin K. was appropriate and that the school district's recommended placement of PAEC High School is the appropriate educational placement for him: "With regard to the student's primary disability, the weight of the testimony and evidence indicates the student's primary disabilities are his behavior and emotional disabilities and the student's current primary classification is correct. It is his behavior which interferes with his ability to learn."

The IHO upheld the School District's IEP for Edwin–placement at the PAEC High School–as reasonably calculated to allow Edwin to receive educational benefit. The IHO also concluded that the School District is providing a FAPE in the least restrictive environment by offering Edwin a placement at the PAEC Alternative High School. The IHO found that there was evidence and testimony to indicate that the District sought to provide the student with more

appropriate educational placements to which the parents objected. The IHO found that there was insufficient evidence and testimony to conclude that the District failed to recognize the need for and to provide adequate disciplinary procedures within the regular education setting.

The IHO ordered that the Parents' independent evaluation be reimbursed because it provided heretofore unrecognized information regarding Edwin's learning disabilities. Yet the IHO found that the District's current primary disability classification of EBD for the Student is appropriate and accurate. She found that the weight of the evidence and testimony indicated that the District became aware of the student's disabilities, worked hard to accommodate his needs, and modified the school program to address the student's disabilities. The IHO also found that the testimony and evidence indicated that the District "worked diligently and tirelessly to provide supplementary aides, services, modifications and supports to this students." She found that the District's recommended placement at the PAEC High School was the appropriate educational placement in the least restrictive environment. Regarding the Parents' request for Acacia Academy, the IHO found that the District offered an appropriate educational placement that was reasonably calculated to provide educational benefit in the least restrictive environment, so that it was not necessary to look elsewhere to Acacia or to any other placement. The IHO found that Edwin's IEP indicated compliance with the federal requirements for an adequate IEP, and that the major reason that progress toward the IEP goals and objectives were stymied was because of the student's behavior and the inappropriateness of the current educational placement; progress would be more likely to occur in the District's recommended educational placement, the PAEC High School. At the hearing, the independent evaluator

introduced evidence that Edwin may have auditory processing disabilities. The School District did not have the opportunity to consider this disability during Edwin's education and to make a determination. The IHO recommended that this issue be considered by an IEP team. The IHO found that the District failed to identify the learning disabilities as identified by the independent evaluator, and that some social work services were not provided for a short period of time but were then instituted. The IHO ordered that the IEP should address the nature of the social work services to be provided to the student, the incorporation of Edwin's learning disabilities into his classification and consideration of the need for an auditory processing evaluation. She ordered the District to provide compensatory education for one semester of summer school and to provide reimbursement to the parents for the cost of the independent evaluation. The IEP team met on June 8, 2001 for purposes of compliance with the due process order.[4]

### xiv. The PAEC High School - the IEP

Mrs. K. did not believe that PAEC High School was appropriate for Edwin because she believed that Edwin would be punished for things that were a manifestation of his disability, and because the students involved in the program had more severe behavior problems. When Mrs. K. discussed PAEC High School with Edwin, he said that he would not go there, but would drop out. Douglas Hopper, the PWHS psychologist, testified that if Edwin is opposed to being in the PAEC program, it would be reasonable to conclude that this would affect his motivation to

---

[4] The Court did not consider Exhibit A of the Defendants, the June 2001 IEP, because Plaintiffs did not have the opportunity for cross-examination, and the Court did not find it necessary to examine Exhibit A for the sake of determining by a preponderance of evidence whether the PAEC High School was the proper IEP for Edwin.

participate. If a student were eighteen years of age or older, as Edwin is, the student could withdraw from the PAEC program. The following undisputed facts about the school. All students enrolled in PAEC High School ("PAEC") have ED or BD as their primary eligibility label. No students have OHI as their primary eligibility label. During the 2000-2001 school year, PAEC High School had 173 students. One hundred fifty-eight students were black, ten were Hispanic, and five were white. One hundred seven had a primary disability of Emotional Disorder. One had a primary disability of Learning Disability. Forty-seven were identified as having a learning disability in addition to their primary disability of ED and one was identified as Other Health Impaired (OHI). Approximately 60-70% of the PAEC High School students are aggressive acting out students. PAEC High School primarily addresses students' behavior. Once behavior is addressed, the student may move to a different placement to address other disabilities the student may have. If a student commits violations in the system, such as failing to bring materials to class or failing to complete homework, and the student has the cognitive ability to understand what he should have done, the student is given the consequence of losing points and is required to spend a certain amount of time in the "time room," a detention room manned with teachers and program assistants. Ms. Pirrello, the PAEC High School social worker, believed that PAEC could carry out Dr. Appleby's educational recommendations if the recommendations were part of Edwin's IEP.

Mrs. K. would like Edwin to be placed at Acacia Academy, on the list of Illinois State Board of Education approved private facilities.

**xv. Dr. Appleby's Examination - July 31, 2000**

Mrs. Edwin K brought Edwin to a private doctor, Michael S. Appleby, a Pediatric Neuropsychologist, to conduct a private examination, which according to Plaintiffs, took place on July 31, 2000. Dr. Appleby found that there is support for ADD as well as a specific learning disability affecting mathematics. Dr. Appleby found that Edwin is suffering from self-esteem problems, and hence his level of commitment to academics is suffering. He made several recommendations for Edwin, including that "Edwin would benefit from placement in a highly-structured and organized academic program, with a good staffing ratio," "Preferential seating within classes, in the front and near the teacher," "Instructions to Edwin should be terse and direct. To ensure that he has understood, it will be most effective to have him repeat back the information, in his own words," "In general, Edwin will benefit from as much external structuring and organizing of his efforts as is possible," "Decreased demands on handwriting, with increased opportunity for word processing," "Provision of class notes so that Edwin can focus his full attention on lecture materials," "Utilization of a homework program, including a homework notebook," ". . .additional time for test-taking, test-taking in a quiet and self-contained environment, and reduced redundant homework demands." None of these recommendations were incorporated into Edwin's IEP by the District. Dr. Appleby testifies that he disagrees with the District's determination on Edwin's September 7, 2000 IEP that Edwin does not have a specific learning disability for several reasons, including the following: a) ADD cannot account for Edwin's pattern of learning difficulties in the specific areas of math and written expression; b) only one inclusionary factor for behavior disorder, inappropriate types of behavior or feelings under normal circumstances is indicated by the school team and the

behaviors identified by the school are all intrinsic to AD/HD; c) only one of three teachers who completed the Devereaux behavior scales categorized Edwin as having a borderline significant score on inappropriate behaviors and feelings; the other two did not indicate a significant score. Dr. Appleby concluded that Edwin has a specific arithmetic learning disability based on the significant discrepancy between Edwin's intellectual functioning and his demonstrated skills. Dr. Appleby's conclusion is that Edwin needs direct remediation and IEP goals and objectives in both math and written expression, and that the IEP should also address Edwin's AD/HD. Dr. Appleby does not believe that Edwin is eligible for special education on the basis of behavior disorder because Edwin's behaviors fit within the context of AD/HD and because Edwin does not present as a student invested in defiance or creating problems for people.[5]

### xvi. Parents' File Suit

Plaintiffs ask the Court to reverse the IHO's Decision and enter summary judgment in favor of Plaintiffs because: (a) The categories under which Edwin. should have been found eligible for special education were Other Health Impaired ("OHI") and Learning Disabled ("LD"), rather than EBD; (b) the District inadequately assessed Edwin's educational needs and failed to properly identify his needs; (c) the District failed to appropriately address Edwin's behavioral difficulties caused by his AD/HD; (d) the District failed to address Edwin's learning disabilities in math and written expression and his auditory processing disability; (e) the IEPs developed by the District for Edwin were not reasonably calculated to allow him to achieve educational benefit; (f) PAEC High School was overly restrictive and inappropriate for a child

---

with Edwin's needs; (g) the District failed to timely deliver or deliver at all services that either were required by the IEP, such as social work services, or which, under the circumstances, were required by law, such as a timely functional behavioral analysis or behavior intervention plan; and failed to develop a plan utilizing positive reinforcements as required by law; (h) the District denied Edwin a FAPE.

## II.    IDEA Standard of Review

Section 1415(i)(2)(B) prescribes the scope of and procedure for judicial review of administrative agency decisions under IDEA:

> "In any action brought under this paragraph, the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. s 1415(i)(2).

In Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982) the Supreme Court held that the statutory provision should not be read as "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Instead, courts must accord "due weight" to the results of state administrative proceedings. To that end, the Supreme Court in Rowley, id. at 206-207, has set forth the judicial inquiry when a parent challenges the appropriateness of a disabled child's educational placement:

> "[A] court's inquiry in suits brought under s [1415(i)(2)][6] is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."

---

[6]The IDEA was amended on June 4, 1997 such that this section number has changed although the text is exactly the same.

In Heather S. v. State of Wis., 125 F. 3d 1045, 1053 (7th Cir. 1997) the Seventh Circuit clarified a reviewing court's limited role in light of the due deference mandated by Rowley:

> First, we note that the "due weight" which the court must give to the hearings below is not to the testimony of witnesses or to the evidence–both of which the court must independently evaluate–but to the decisions of the hearing officers.

"Due weight" necessarily implies some sort of deference to the agency's decision, and moreover, considering the IHO's special expertise in education law, the Court think a sound basis exists for giving deference to the decisions of the hearing officers. See Board of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ., 41 F. 3d 1162, 1167 (7th Cir. 1994). Therefore, the Court in this opinion independently evaluates the evidence in the record, while viewing the hearing officers' decisions through a deferential lens.

## III. The Individuals with Disabilities Education Act

### A. Purpose of the IDEA

The IDEA was enacted to ensure that all handicapped children in the United States are provided with a free appropriate public education ("FAPE"), which is provided through the use of an Individualized Educational Program ("IEP"). 20 U.S.C. § 1414(d). A FAPE is one "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." See Board of Educ. v. Rowley, 458 U.S. 176, 188-189, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The IEP is the "primary vehicle" of the IDEA's implementation. Honig v. Doe, 484 US. 305, 310 (1988). The IEP, mandated for each disabled child, is an educational plan developed specifically for the child by the local school district, the child's teacher, the parents or guardians, and, when appropriate, the child. 10 U.S.C. § 1414(d)(1)(B). "[T]he IEP sets out the child's present educational performance, establishes annual

and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig, 484 U.S. at 311. The IEP must be annually reviewed and revised when necessary. 20 U.S.C. § 1414(a)(2). Students are eligible for services pursuant to an IEP if the school determines that the student satisfies the criteria for at least one of the disability categories enumerated in the IDEA, which includes ADD, Emotional Disturbance, and Other Health Impairment. 20 U.S.C. § 1401 "[T]he purpose of the IDEA is to open the door of public education to [disabled] children, not to educate a [disabled] child to her highest potential." Heather S., 125 F. 3d at 1054.

The IDEA requires a state to determine what is uniquely "appropriate" for each child's education by preparing an IEP developed through the joint participation of the local education agency, the teacher, and the parents. 20 U.S.C. §§ 1414(d)(1)(B).

Section 1415(f) of the IDEA provides for a hearing process to challenge the adequacy of the IEP when informal procedures have failed. Following the final administrative determination, the party aggrieved by the decision of the state educational agency has the right to challenge the decision through a civil action brought in either state or federal court. Dell v. Board of Educ., Twp. High Sch. Dist. 113, 32 F.3d 1053, 1055-6 (7th Cir. 1994). "The party challenging the outcome of the state administrative decision bears the burden of proof." Heather S., 125 F. 3d at 1052.

Under the IDEA, a school district must: (1) follow the procedures set forth in the Act; and (2) develop an IEP through procedures reasonably calculated to enable the child to receive educational benefits. See Board of Educ. of Murphysboro Community Unit School Dist. No. 186 v. Illinois State Bd. of Educ., 41 F.3d 1162, 1166 (7th Cir. 1994), (citing Rowley, 458 U.S. at 206-07, 102 S.Ct 3034). "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." Murphysboro, 41 F. 3d at 1166.

## B. Procedural Violations

The Court's first inquiry under Rowley is whether the District has complied with IDEA procedures. See Rowley, 458 U.S. at 206. Parents are entitled to reimbursement for the cost of a unilateral placement when the school district has violated the IDEA by failing to follow the procedures set forth in the Act, which in turn results in a denial of a FAPE. Board of Educ. of Murphysboro v. Illinois State Bd. of Educ., 41 F. 3d 1162, 1168 (7th Cir. 1994).

Plaintiffs have alleged the following procedural violations[7]: for two years Edwin had no BIP; Edwin's IEP lacked the IDEA requirements of present levels of performance and objective measurable goals; the School District never conducted a functional vocational evaluation of Edwin and the October 1998 transitional plan contained no services or skills specific to his chosen vocation, and no services or skills that would assist him to be successful in competitive employment in violation of 20 U.S.C. § 1401(a)(19); the school had a screening team meeting on March 25, 1998, but no assistance was given to Edwin and no case study evaluation was completed until October 8, 1998, in excess of the required 60 school days in which a case study evaluation should be completed under the Illinois special education regulations after referral; the District failed to provide Edwin with consistent social work services in violation of 20 U.S.C. 1401(8) (the requirements of IDEA); the District failed to advise staff of the existence of an IEP, to require them to follow it, or to provide them the training and support necessary to follow it, in violation of Edwin's right to FAPE under the IDEA, 20 U.S.C. § 1414(d); 34 CFR § 300.342; the School District failed to consider the input of Edwin's mother, of Dr. Appleby, or of Edwin (and his likelihood of dropping out if enrolled at

---

[7]The Court notes that Plaintiffs have not explicitly labeled these as procedural violations.

PAEC), when determining what services and school placement would provide educational benefit to Edwin, and this failure to consider parent input and/or outside evaluation denied Edwin of a FAPE.

While the IHO did find certain procedural violations, she also concluded that the District did not deny Edwin a FAPE. The Court finds that a preponderance of the evidence supports the IHO's conclusion. The IHO did find that there were some social work services that were not provided to Edwin for a short period of time, but then instituted. The IHO also found that there was some clarification needed regarding the nature of the social work services to be provided, including whether or not they should be consultative or direct services. The IHO ordered the District to deliver one month of compensatory social work services in the form of additional direct social work services for a period of time per week equal to that which he was then receiving at the time of the due process hearing.

Regarding Plaintiff's allegation that the District did not consider the likelihood that Edwin would drop out if enrolled at the PAEC School, the IHO found that "there is nothing in the federal or state rules which require a school district guarantee that a student will remain in high school long enough to receive a high school diploma." Plaintiffs refer to the Seventh Circuit opinion in Board of Ed. of Community Consolidated School District 21 v. Illinois State Board of Education, 938 F. 2d 712 (7th Cir. 1991), in which the Seventh Circuit upheld the district court's factual finding that the "parents' attitudes were severe enough to doom any attempt to educate" the student at the placement preferred by the school district, and therefore the student would be denied an IEP if the district court reversed the hearing officer's decision and ordered the student to attend the school

preferred by the school district. However, Edwin's reluctance to attend the PAEC School, a reluctance encouraged by his parents, does not rise to the level of hostility of the student in <u>Board of Ed. of Community. Consolidated School District 21</u>. The Court finds that Edwin's parents have not "poisoned" the option of the PAEC School in Edwin's mind.

With respect to the lack of a BIP, the IHO found that "a behavioral intervention plan was not statutorily necessary." Moreover, she stated that the District was aware of Edwin's behavioral difficulties, was actively implementing different accommodations and modifications, and was trying to address Edwin's challenges through a number of both positive strategies as well as other disciplinary strategies. The Court finds that a preponderance of the evidence in the Administrative Record supports this conclusion that the District made many accommodations and efforts to address Edwin's behavioral problems.

The Court notes that the existence of procedural flaws does not ipso facto mean that a FAPE was denied to the student. "Procedural flaws do not automatically require a finding of a denial of a [FAPE]. However, procedural inadequacies that result in the loss of educational opportunity. . .clearly result in the denial of a [FAPE]." <u>W.G. v. Board of Trustees.</u> 960 F. 2d 1479, 1484 (9th Cir. 1992). The Court holds that the procedural flaws that the Plaintiffs allege did not result in the denial of a FAPE to Edwin.


## C. Substantive Inquiry

The Court's second inquiry under <u>Rowley</u> is whether the District's proposed IEP was "reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 207. The

issue is whether the District's proposed placement was appropriate, "not whether another placement would also be appropriate, or even better for that matter." Heather S., 125 F. 3d at 1057. The District is required to provide an appropriate education, "not the best possible education,. . .or the placement the parents prefer." Id. The District satisfies its requirements under the IDEA by

> providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expenses, must meet the state's educational standards, must approximate the grade levels used in the state's regular education and must comport with the child's IEP.

Rowley, 458 U.S. at 203. There is not "any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." Id. at 202. The appropriate concern is finding a program which will be of educational benefit to the child. Board of Educ. of Community Consol. Sch. Dist. No. 21 v. Illinois State Bd. of Educ., 938 F. 2d 712, 717 (7th Cir. 1991).

Plaintiffs maintain that the District should have made Edwin eligible for services and accommodations as a student who was "other health impaired" ("OHI") and learning disabled, and argue that the District's inadequate assessment of Edwin's disability resulted in an inadequate IEP. Plaintiffs argue that the District never evaluated Edwin to determine whether he had AD/HD, and mistakenly chose to attribute Edwin's behavioral difficulties to BD/ED rather than to AD/HD, resulting in a failure to provide appropriate services. Plaintiffs also argue that the District failed to identify and assess Edwin's severe learning disabilities in math and written expression. Therefore, Plaintiffs argue that Edwin was denied a FAPE because his IEP was not reasonably calculated to provide him meaningful educational benefit.

The IHO determined, however, that Edwin's primary disability was his emotional/behavioral disability ("EBD") and that it was his behavior which interfered with his

ability to learn. Indeed, Edwin has been identified as a student with an EBD since the eighth grade. In addition, the District noted its acknowledgment of Edwin's diagnosis of ADD and the fact that he was taking medication for this condition within two months of his entrance into PWHS. Moreover, the Court finds that a preponderance of evidence in the record supports the IHO's conclusion that Edwin's primary disability is EBD. Edwin's truancy, lack of participation in class, failure to turn in work or bring a notebook to class or come to class on time, and lack of cooperation with teachers is amply supported in the Administrative Record (e.g. A. R. p. 977, 980, 981, 989, 993, 994, 996, 998, 1008, 102-3, 1017, 1026, 1031, 1038-40, 1005). On the day that Edwin's suicide note was found, he returned to school property in possession of alcohol and marijuana. The IHO noted that "it is the finding herein that the evidence and testimony indicate the student's behavior goes beyond symptoms of ADD and these behaviors are the major impediment to his ability to achieve success in school." Plaintiffs provide support from Dr. Appleby's testimony that Edwin suffered from a math disability. Edwin may well have additional math deficiency and other learning disabilities, but the IHO concluded that it was his BD which was preventing him from succeeding in school. Edwin was re-evaluated in June 2000 by Douglas Hopper at the TALENTS program Mr. Hopper testified that Edwin's mathematics reasoning and math composite score were both below average. However, Edwin's test behavior, his refusal to use pencil and paper for math figuring, could not be excluded as a contributing factor. In addition, Mr. Hopper was aware that Edwin's actual performance in class was compromised by Edwin's behaviors which include falling asleep, not completing required class work, failure to bring supplies and materials to class, and showing little concern for learning.

However, that Edwin may have other disabilities does not contradict that EBD is his primary disability, and that the PAEC School is the proper placement for him. During the administrative hearing, the parties and IHO heard the testimony of three representatives from the PAEC program: Mr. Terry Smith, Mr. Tim Manning and Ms. Lisa Perillo. Mr. Tim Manning testified that once the behavioral problem is addressed in a student, that student can be transferred to a "room where the primary focus then became LD and the safety net of ED was still in there as you transition from the PAEC program to another program." (A.R. 3201) Mr. Manning said of the students with ADD, like Edwin, at PAEC, "[y]ou can address their behavioral and their academics, and then as a matter of course when you can get them to make the correct behavioral choices so they are not impeding their opportunity to maximize success and you could do it over a sustained period of time, then you look to–look at a different environment to begin . . . transitioning them back." (A.R. 3201) The Court finds that EBD is Edwin's primary disability and that the PAEC School is the proper placement for Edwin. Mr. Manning's testimony supported the fact that the PAEC High School program was able to address the needs of students who had passive/aggressive behaviors. Several teachers testified that Edwin exhibited such passive/aggressive behavior; his behavior included defiance and disrespect for authority, though not demonstrating physical aggressiveness. The Court finds that a preponderance of the evidence supports the conclusion that Edwin's primary disability was EBD. The Court finds that Edwin was not denied a FAPE because his IEP was reasonably calculated to provide him meaningful educational benefit.

Moreover, as the Seventh Circuit stated in Heather S., "In any event, whether Heather was described as cognitively disabled, other health impaired, or learning disabled is all beside the point.

The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education." Heather S., 125 F. 3d 1045 at 1055. A disabled child's individual education plan must be tailored to the unique needs of that particular child. Rowley, 458 U.S. at 181. It may very well be that Edwin suffers from a math deficiency, and the District has recognized that Edwin suffers from ADD. However, the Court defers to the IHO's conclusion that it is his BD which is his primary disability, and which needs to be addressed first, before his math deficiency and motor visual skills, and any other deficiency, can be addressed.

Plaintiffs argue that Edwin should not be segregated into a separate and unequal educational environment based on a disability level, but that a court is required to uphold the least restrictive placement if the child's IEP could be implemented reasonably satisfactorily at that placement. However, the Seventh Circuit held in Lachman v. Illinois State Board of Education, 852 F. 2d 290 (7th Cir. 1988), "[c]ourts have determined that the Act's mainstreaming preference is to be given effect only when it's clear that the education of the particular handicapped child can be achieved satisfactorily in the type of mainstream environment sought by the challengers of the IEP proposed for that child." As the facts demonstrate, Edwin has not made progress in a regular education environment, despite the District's efforts. The District started, in response to Edwin's challenges, to place him in the least restrictive environment first; first at the BD resource program at PWHS, then at TALENTS. At TALENTS, although his attendance and arrival to class on time improved, he still struggled academically and passed only one course during the entire second semester of 2000. The TALENTS staff tried to accommodate Edwin and would determine the average amount of time required to complete a computer aided assignment and would tell Edwin when he should be

halfway completed with the assignment, but this was ineffective; unlike the PAEC School, TALENTS had no behavioral management plan. The District deferred to Edwin's parents' wishes for a regular education setting for an extended period of time, despite the District's recommendation that PAEC was the best placement for Edwin. Indeed, the Court is saddened by the fact that the District's deferring to the parent's wishes led to Edwin not accepting the District's recommended placement, the PAEC School, at the time that the District recommended it in 1998.

The Court finds that the placement at PAEC High School is reasonably calculated to enable Edwin to receive educational benefits. "The school district has met the substantive requirements of the [IDEA] if its proposed placement is reasonably calculated to be of educational benefit to the handicapped child." Board of Educ. of Community Consol. Sch. Dist. 21, 938 F. 2d at 716. The Court's review of the administrative record supports the IHO's conclusion that the PAEC placement provides a FAPE to Edwin in the least restrictive environment.

Edwin's parents focus on Dr. Appleby's alleged opposition to Edwin's placement at the PAEC School. However, the Court notes that Dr. Appleby had only out-of-school contact with Edwin, unlike the school psychologist, and the numerous teachers of Edwin whose testimony is in the record. Moreover, the Court's deference is to trained educators, not necessarily psychologists. See Heather S., 125 F. 3d 1045 at 1057. As the Seventh Circuit stated in Heather S., "[w]hile [psychologists] certainly have a role to play, and can contribute meaningful insight to the evaluation of a student, the school district is required to bring a variety of persons familiar with a child's needs to an IEP meetings, including, specifically, teachers." Id; see also 34 C.F.R. § 300.344. In addition, a great number of teachers and other professionals over a number of years were involved in

assessing Edwin's needs, and Dr. Appleby's knowledge was limited: he never observed Edwin in the classroom.

Edwin's parents would like the Court to find that Edwin should be placed at the private facility, Acacia School. However, a school district is required by the statute and the regulations to provide an appropriate education, not the best possible education. Board of Educ. of Community Consol. Sch. Dist. 21 v. Illinois State Bd. of Educ., 938 F. 2d at 715 (citing Rowley, 458 U.S. at 192) or the placement the parents prefer. Lachman v. Illinois State Bd. of Educ., 852 F. 2d 290, 297 (7th Cir. 1988). This is not to say that the PAEC School is not the best possible education. A court is particularly incapable of making such judgments, which is why it must defer to trained educators and not substitute "'[its] own notions of sound educational policy for those of the school authorities which they review.'" Bd. of Educ. of Community Consol. Sch. Dist. 21, 928 F. 2d at 715 (quoting Rowley, 458 U.S. at 206).

The Court does note however, that once a student's BD is addressed at PAEC, he could be transferred to another environment where his ED and LD were addressed. Indeed, the Court finds it sad, even tragic that if the District had not deferred to the parents' wishes for TALENTS against its recommendation based upon several IEPs that PAEC was the proper placement, Edwin would have been able to receive the proper help for his disability sooner by having his emotional behavioral disability addressed several years ago.

In sum, the Court's review of the evidence confirms that the great weight of the evidence supports the placement at the PAEC School recommended by the District. The Court upholds the IHO's decision.

The Court, however, orders that the District should include in the IEP the recommendations of the independent evaluator, Dr. Appleby. The IHO did find that the District failed to identify the student's learning disabilities which were identified by Dr. Appleby. As a result, the IHO ordered the District to provide compensatory education for one semester of summer school, and to reimburse the parents for the cost of the independent evaluation that identified Edwin's learning disabilities. The Court will take one step further. A district court has discretion to impose equitable remedies pursuant to the IDEA. See Heather S. 125 F. 3d at 783.; 20 U.S.C. § 1415. The IHO ordered that the Parents' independent evaluation by Dr. Appleby be reimbursed because it provided heretofore unrecognized information regarding Edwin's learning disabilities. Mrs. Pirrello said in her testimony that she believed that Dr. Appleby's recommendations could be carried out at the PAEC School if the recommendations were part of Edwin's IEP. (A.R. 250-251). The Court hereby orders that these recommendations should be included in Edwin's IEP, and that the District should ensure that the recommendations, where feasible, should be implemented at the PAEC School for Edwin during his attendance there. The Court also orders the School to pay for auditory processing testing of Edwin. In addition, the Court increases the IHO's ordering of one month of compensatory social work services to compensatory social work services for eight months--the entire period of time that they were not provided to Edwin.

It is the Court's sincere hope that Edwin enrolls at the PAEC School despite his parents' testimony of his reluctance to attend the PAEC School.

01 C 7115

ORDERED:

ENTER:

GEORGE W. LINDBERG
Senior U.S. District Judge

JUL 0 1 2002

DATED: